# EXHIBIT E

IN THE COURT OF COMMON PLEAS
WESTMORELAND COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | | |
|---|---|---|
| ARMSLIST LLC, | ) | |
| | ) | |
| TORQUELIST LLC, | ) | CASE NO.:  21CI03063 |
| | ) | |
| JONATHAN GIBBON, | ) | JUDGE:  HATHAWAY |
| | ) | |
| and | ) | DOCUMENT: |
| | ) | |
| N. ANDREW VARNEY, III, | ) | **SECOND AMENDED AND** |
| | ) | **SUPPLEMENTAL   COMPLAINT IN** |
| Plaintiffs, | ) | **CIVIL ACTION FOR DAMAGES** |
| vs. | ) | **UNDER PA COMMON LAW,** |
| | ) | **DECLARATORY, AND INJUNCTIVE** |
| FACEBOOK, INC., | ) | **RELIEF** |
| | ) | |
| and | ) | FILED ON BEHALF OF PLAINTIFFS, |
| | ) | ARMSLIST LLC, TORQUELIST LLC, |
| INSTAGRAM, LLC., | ) | JONATHAN GIBBON, AND |
| | ) | N. ANDREW VARNEY, III |
| Defendants. | ) | |

COUNSEL OF RECORD
CHARLES ANDREW HAYES, ESQUIRE
PA I.D. NO.: 330964
WEGMAN HESSLER
6055 ROCKSIDE WOODS BLVD.
STE. 200
CLEVELAND, OHIO 44131
216-642-3342 (PHONE)
cahayes@wegmanlaw.com

12/02/2021 09:05 PM Westmoreland County   21CI03063

IN THE COURT OF COMMON PLEAS
WESTMORELAND COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | | |
|---|---|---|
| ARMSLIST LLC, | ) | |
| | ) | |
| TORQUELIST LLC, | ) | CASE NO.:  21CI03063 |
| | ) | |
| JONATHAN GIBBON, | ) | JUDGE:  HATHAWAY |
| | ) | |
| and | ) | |
| | ) | |
| N. ANDREW VARNEY, III, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| INSTAGRAM, LLC., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
Westmoreland Bar Association
P.O. Box 565
Greenburg, PA 15601
(724) 834-8490
http://lrs.westbar.org

12/02/2021 09:05 PM Westmoreland County   21CI03063

IN THE COURT OF COMMON PLEAS
WESTMORELAND COUNTY, PENNSYLVANIA
CIVIL DIVISION

ARMSLIST LLC,                          )
                                       )
TORQUELIST LLC,                        )        CASE NO.:  21CI03063
                                       )
JONATHAN GIBBON,                       )        JUDGE:  HATHAWAY
                                       )
and                                    )
                                       )
N. ANDREW VARNEY, III,                 )
                                       )
                    Plaintiffs,        )
vs.                                    )
                                       )
FACEBOOK, INC.,                        )
                                       )
and                                    )
                                       )
INSTAGRAM, LLC.,                       )
                                       )
                    Defendants.        )

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

AND NOW COME the Plaintiffs, Armslist LLC, Torquelist LLC, Jonathan Gibbon, and

N. Andrew Varney, III, by and through their counsel, Charles Andrew Hayes, Esquire of

WEGMAN HESSLER and file the following Complaint and in support thereof, aver as follows:

1.      Plaintiff Armslist LLC ("Armslist") is a Pennsylvania limited liability company

with its principal place of business at 616 Magee Ave., Jeannette, Pennsylvania.

2.      Plaintiff Torquelist LLC ("Torquelist") is a Pennsylvania limited liability company

with its principal place of business at 616 Magee Ave., Jeannette, Pennsylvania.

12/02/2021 09:05 PM Westmoreland County   21CI03063

12/02/2021 09:05 PM Westmoreland County   21CI03063

3.      Plaintiff Jonathon Gibbon is an adult individual having an address of 616 Magee Ave., Jeannette, Pennsylvania, and is the Chief Executive Officer and sole member of Armslist and Torquelist.

4.      Plaintiff N. Andrew Varney, III, is an adult individual resident of Pittsburgh, Pennsylvania, having an address of 616 Magee Ave., Jeannette, Pennsylvania, and is a contractor to Armslist.

5.      Defendant Facebook, Inc. is a Delaware corporation, doing business globally, with its principal place of business in Menlo Park, California.  Facebook maintains an office and an agent for service in Pennsylvania and at all times relevant to this complaint, through its global social media platform, does business in Westmoreland County, Pennsylvania.  Facebook's address for service is Corporation Service Company, 2595 Interstate Dr. #103, Harrisburg, PA 17110.

6.      Defendant Instagram, LLC. is a Delaware limited liability company, doing business globally, with its principal place of business in California Instagram's parent maintains an office in Pennsylvania, maintains an agent for service in Pennsylvania, and through its global social media platform does business in Westmoreland County, Pennsylvania.  Instagram is a wholly owned subsidiary of Facebook.  Instagram's Terms of Use state, "The Instagram Service is one of the Facebook Products, provided to you by Facebook, Inc. These Terms of Use therefore constitute an agreement between you and Facebook, Inc."   (Instagram Terms of Use, https://help.instagram.com/581066165581870, accessed 7-21-21).  Instagram's address for service is  Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808.

## NATURE OF THE ACTION

7.      This is an action seeking damages under Pennsylvania's common law and declaratory and injunctive relief under the Pennsylvania Constitution.

8.    The U.S. Supreme Court has recognized that "[a] fundamental First Amendment principle is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. Today, one of the most important places to exchange views is cyberspace, particularly social media, which offers "relatively unlimited, low-cost capacity for communication of all kinds," (*Reno v. American Civil Liberties Union,* 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874) to users engaged in a wide array of protected First Amendment activity on any number of diverse topics. *Packingham v. North Carolina,* 137 S.Ct. 1730, 1732, 198 L.Ed.2d 273.

9.    Similarly, the Pennsylvania Supreme Court has noted that "[i]n this era, cyberspace in general and social media in particular have become the lifeblood for the exercise of First Amendment rights." *Friends of Danny DeVito v. Wolf,* 227 A.3d 872, 903, *cert. denied,* 141 S.Ct. 239, 208 L.Ed.2d 17.

10.    At the same time, however, the movement from public squares and editorial pages to social media as the primary place to exchange ideas has come with a troubling consequence. Social media platforms, as private entities, have exercised the power to remove or silence the voices of many Americans, and justify such censorship on the basis that because social media platforms are not state actors, they are not bound by the First Amendment.

11.    Numerous commentators, including a Supreme Court Justice, recognize this trend and its challenge to the nation's tradition and protection of free speech and expression. Concurring in *Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220, 1224 (2021), Justice Thomas wrote:

> Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties. We will soon have no choice but to address how our legal doctrines apply to highly concentrated, privately owned information infrastructure such as digital platforms.

12/02/2021 09:05 PM Westmoreland County    21CI03063

12.     Even more troubling, in some cases social media companies appear to be censoring or silencing certain points of view at the implicit (and sometimes explicit) behest of government actors. See *Facebook Banned 1.3 Billion Accounts Over Three Months to Combat "Fake" and "Harmful" Content,* FORBES, Mar. 22, 2021, https://www.forbes.com /sites/melissaholzberg/2021/03/22/facebook-banned-13-billion-accounts-over-three-months-   to-combat-fake-and-harmful-content/?sh=1d8f8ac55215. In the United States, members of both political parties have threatened regulation of, or even "closing down," social media platforms unless they allowed or disallowed certain posts. See, *e.g.,* *Trump Threatens* https://www.cnn.com/2020/05/27/tech/trump-social-media-threat/index.html;        https://rush. house.gov/media-center/press-releases/rush-leads-colleagues-in-letter-to-facebook-urging-decisive-action.  And, as the L.A. Times has reported, "[i]n some countries such as Vietnam and India, Facebook has deliberately ignored its own standards in order to placate powerful governments and protect its business."  See Shashank Bengali, *Facebook banned Trump but has failed to react quickly to other leaders who incited violence*, L.A. TIMES, Jan. 15, 2021, https://www.latimes.com/world-nation/story/2021-01-15/facebook-social-media-bans-trump-capitol-riot.

13.     Firearms are now, and have since the nation's earliest days been, an important tool and symbol of American freedom.

14.     While firearms have been part of America's cultural and political fabric since colonial days, efforts to regulate firearms have been the subject of passionately held differences among Americans, and thereby receive significant political attention.

15.     Proponents of the right to keep and bear firearms consider it a core component of public safety and a final guarantor of liberty.   Those seeking comprehensive limits on that right

12/02/2021 09:05 PM Westmoreland County   21CI03063

express overriding concern about the ubiquity of guns in America, and their use in street crime, suicides, and mass shootings.  They argue vociferously for limits on guns sales and possession, ranging from complete bans to regulation of certain types of sales, and stricter background checks. As such, this national debate, particularly as it plays out online in social media, arouses strong feelings on all sides.

16.     Because the right to keep and bear arms is guaranteed in the U.S. Constitution (as well as the constitutions of forty-four states),[1] public conversations regarding guns, regulations relating to gun sales, or even the wisdom of gun ownership are thus inherently political and therefore constitutionally protected speech.

## PARTIES

## JURISDICTION AND VENUE

17.     Under Pennsylvania's long-arm statute, Pennsylvania courts can exercise personal jurisdiction over non-residents of the state.  See 42 Pa. Cons. Stat. Ann. § 5322(b).

18.     A Pennsylvania court can exercise general personal jurisdiction consistent with the Fourteenth Amendment when a non-resident defendant has engaged in "systematic and continuous" activities in the forum state.  *Gorman v. Jacobs*, 597 F.Supp.2d 541, 546, citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

19.     In addition to Instagram engaging in systematic and continuous activities in Pennsylvania, the court can also exercise specific personal jurisdiction over Instagram because the

---

[1] See, e.g., Pennsylvania Constitution, Article I, Section 21 "The right of the citizens to bear arms in defense of themselves and the State shall not be questioned."

12/02/2021 09:05 PM Westmoreland County   21CI03063

activity at issue was purposefully directed at Armslist, Torquelist, Mr. Gibbon, and Mr. Varney in Pennsylvania, and the activity complained of has been realized in Pennsylvania.

20.     In addition to Facebook engaging in systematic and continuous activities in Pennsylvania, the court can also exercise specific personal jurisdiction over Facebook because the activity at issue was purposefully directed at Armslist, Torquelist, Mr. Gibbon, and Mr. Varney in Pennsylvania, and the activities complained of have been realized in Pennsylvania.

21.     Venue is proper in Westmoreland County under 231 Pa. Code §2179 (a) (2), (3), and (4) because Facebook regularly conducts business in Westmoreland County and Westmoreland County is the County where the occurrence giving rise to this action took place.

22.     Venue is proper in Westmoreland County under 231 Pa. Code §2179 (a) (2), (3), and (4) because Instagram, and its parent company Facebook, regularly conducts business in Westmoreland County and Westmoreland County is the County where the occurrence giving rise to this action occurred.

**FACTUAL BACKGROUND**

**A.     Armslist.com**

23.     Armslist.com is an online platform created by Armslist LLC, that allows third parties to communicate regarding buying, selling, and trading firearms and related accessories.

24.     Armslist LLC, conducts its platform business online only; it does not have a brick-and-mortar presence.

25.     Armslist LLC, does not buy, sell, or trade firearms itself, nor does it receive any portion of the proceeds of any sales conducted on its platform.  Rather, it simply allows platform users to post their own advertisements, much like classified ads in a newspaper or similar publication.

9

12/02/2021 09:05 PM Westmoreland County   21CI03063

26.     Upon reaching Armslist's website, a user is met with the "Terms of Use" and asked to confirm that he or she is 21 years of age or older, that "Armslist is NEVER involved in transactions between parties and DOES NOT certify, investigate, or in any way guarantee the legal capacity of any party to transact." Armslist.com Terms of Use, (last accessed June 7, 2021) (emphases in original).

27.     Armslist.com's Terms of Use further require visitors to its website to acknowledge that they are responsible for obeying all applicable federal, state, local and tribal "statutes, rules, regulations, judicial decisions, and all applicable Presidential Executive Orders, including compliance with all applicable licensing requirements."

28.     Users further agree that "using Armslist.com for any purpose contrary to any applicable federal, state, municipal or tribal laws or regulations constitutes using Armslist.com for an 'illegal purpose,'" that they will not use Armslist.com for any illegal purpose, and that doing so may constitute a federal crime.

29.     The Terms of Use also advise users who are unsure about the legality of any proposed firearm sale or transfer to contact the Bureau of Alcohol, Tobacco, Firearms and Explosives, and provide phone and internet contact information for that governmental authority.

30.     Armslist.com's Terms of Use also explicitly state that while "ARMSLIST ABSOLUTELY BELIEVES AND CHAMPIONS 'the right of the people to keep and bear arms,'" it will "comply with federal, state, municipal, and tribal law enforcement entities pursuant to the Constitution of the United States and Due Process of Law."  Armslist has made good on this commitment by assisting law enforcement entities in their investigation and prosecution of illegal firearms sales.

31. Jonathan Gibbon created Armslist in 2007 after learning that large third-party bulletin board services such as eBay and Craigslist, due in large part to political pressure, stopped allowing classified advertisements for firearms.

32. Believing strongly in the right of citizens to keep and bear arms, Mr. Gibbon created Armslist as a classified advertisements site that permits the listing of firearms.

33. Armslist makes money by selling advertisements on its website. In addition, Armslist sells premium membership designations for users and businesses that frequently use the site. Only premium members are permitted to post classified advertisements.

**B.    Facebook Creates a Public Platform for Speech**

34. Facebook launched in 2004 as a social media platform that allows users to share comments, photos, videos, weblinks and other information with other Facebook users who have chosen to receive such posts ("Friends").

35. Facebook is the largest social networking site on earth with over 2.8 billion users and over 190 million users in the United States alone. Over 69% of US adults have a Facebook account.

36. Facebook has also been a runaway financial success.

37. Facebook's financial success is the result of connecting advertisers with the huge bank of personal information provided by Facebook's users.

38. Most of Facebook's revenue derives from third party advertising—which is valuable because of Facebook's access to users' and non-users' data.

39. Facebook does not charge a fee for users to access its services. Instead, Facebook requires users of its services to provide sensitive and valuable personal, and private, information to Facebook. Further, Facebook conditions membership upon users accepting text files, known as

"cookies", on the user's computer; the cookies allow Facebook to intercept a user's electronic communications and track the user's browsing history.

40.     Facebook's users create content that, unless rendered private by the user, is publicly available. Public posts are viewable not just within the Facebook website or app but also via search engine results. For example, before Facebook terminated Armslist's account, someone that searched Google's search engine for "Armslist" could have found Armslist's Facebook page.

41.     Facebook's current Terms of Service highlight Facebook's exploitation of user data in exchange for allowing access to the Facebook platform:

> …We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.
>
> Protecting people's privacy is central to how we've designed our ad system.  This means that we can show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data.  We allow advertisers to tell us things like their business goal, and the kind of audience they want to see their ads…We then show their ad to people who might be interested.
>
> We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Facebook.  For example, we provide general demographic and interest information to advertisers…to help them better understand their audience.  We don't share information that directly identifies you…unless you give us specific permission…
>
> (Facebook Terms and Conditions, attached to Defendants' Preliminary Objections to First Amended Complaint)

42.     Facebook has a history of misrepresenting the scope of use of the data it collects from users.  For example, in 2010 and 2011, a researcher determined that Facebook's cookies would remain on a user's system, and continue tracking user activity, even after the user had logged out. Notably, at the time, Facebook's online help center assured users that it did not do this.

43.     Similarly, today the scope of Facebook's exploitation of personal information extends far beyond what it discloses in its current Terms of Service.

44.     Indeed, recent reporting[2] has revealed Facebook convinced third party businesses to use Facebook tracking software in their apps, websites, and loyalty programs. The software compiles data derived from user activity then provides the data to Facebook. Importantly, the accumulated data does not necessarily relate to a Facebook user. Facebook then attempts to match the data with a user's account.  But regardless of whether there is such an account, Facebook accumulates data on non-Facebook internet user's activities.

45.     Facebook's business activities are not limited to exploiting user data to sell advertisements. For example, in 2016, Facebook launched a "Free Basics" initiative in various parts of the so-called Global South—e.g., many African countries—that essentially traded internet connectivity for becoming the exclusive portal through which users could access a curated, stripped-down version of the Internet.

46.     Facebook owns Instagram.

47.     Facebook allows businesses to maintain "business pages," whereby the businesses can communicate with their customers.

48.     Facebook holds itself out as a public forum where people and businesses can share ideas and connect with one another. For example, Facebook's current Terms of Service state:

> Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you:
>
> **Provide a personalized experience for you**:
>
> Your experience on Facebook is unlike anyone else's: from the posts, stories, events, ads, and other content you see in News Feed or our video platform to the Pages you follow and other features you might use, such as Trending, Marketplace, and search. We use the data we have - for example, about the connections you make, the choices and settings you select, and what you share and do on and off our Products - to personalize your experience.

---

[2] *See https://www.seattletimes.com/business/technology/theres-no-escape-from-facebook-even-if-you-dont-use-it/*

12/02/2021 09:05 PM Westmoreland County   21CI03063

12/02/2021 09:05 PM Westmoreland County   21CI03063

**Connect you with people and organizations you care about:**

We help you find and connect with people, groups, businesses, organizations, and others that matter to you across the Facebook Products you use. We use the data we have to make suggestions for you and others - for example, groups to join, events to attend, Pages to follow or send a message to, shows to watch, and people you may want to become friends with. Stronger ties make for better communities, and we believe our services are most useful when people are connected to people, groups, and organizations they care about.

**Empower you to express yourself and communicate about what matters to you:**

There are many ways to express yourself on Facebook and to communicate with friends, family, and others about what matters to you - for example, sharing status updates, photos, videos, and stories across the Facebook Products you use, sending messages to a friend or several people, creating events or groups, or adding content to your profile. We have also developed, and continue to explore, new ways for people to use technology, such as augmented reality and 360 video to create and share more expressive and engaging content on Facebook.

**Help you discover content, products, and services that may interest you:**

We show you ads, offers, and other sponsored content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Facebook Products. Section 2 below explains this in more detail.

**Combat harmful conduct and protect and support our community:**

People will only build community on Facebook if they feel safe. We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action - for example, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data with other Facebook Companies when we detect misuse or harmful conduct by someone using one of our Products.

**Use and develop advanced technologies to provide safe and functional services for everyone:**

We use and develop advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location. For example, technology like this helps people who have visual impairments understand what or who is in photos or videos shared on Facebook or Instagram. We also build sophisticated network and communication technology to help more people connect to the internet in areas with limited access. And

14

we develop automated systems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products.

**Research ways to make our services better:**

We engage in research to develop, test, and improve our Products. This includes analyzing the data we have about our users and understanding how people use our Products, for example by conducting surveys and testing and troubleshooting new features. Our Data Policy explains how we use data to support this research for the purposes of developing and improving our services.

**Provide consistent and seamless experiences across the Facebook Company Products:**

Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you. We design our systems so that your experience is consistent and seamless across the different Facebook Company Products that you use. For example, we use data about the people you engage with on Facebook to make it easier for you to connect with them on Instagram or Messenger, and we enable you to communicate with a business you follow on Facebook through Messenger.

**Enable global access to our services:**

To operate our global service, we need to store and distribute content and data in our data centers and systems around the world, including outside your country of residence. This infrastructure may be operated or controlled by Facebook, Inc., Facebook Ireland Limited, or its affiliates.

(Facebook Terms and Conditions, facebook.com/terms.php, accessed 7-12-21).

49.    Similarly, Facebook's current Community Standards reaffirm its commitment to providing a forum for users to express themselves.  Indeed, a subsection to the Introduction of Facebook's Community Standards carries the heading: **REITERATING OUR COMMITMENT TO VOICE** (emphasis in original).

50.    For individuals and businesses like Plaintiffs that seek to market products and services on the Internet, a Facebook and Instagram presence is essential.  Further, there is only one way to get such a presence: agree to whatever terms Facebook and Instagram may require.

51.     There is no reasonable or realistic prospect of negotiating contract terms with Defendants for comparatively small businesses like Armslist and Torquelist and private figures like Mr. Gibbon and Mr. Varney.

52.     Further, under the heading, **REITERATING OUR COMMITMENT TO VOICE,** Facebook states that "The goal of our Community Standards has always been to create a place for expression and give people a voice. This has not and will not change. Building community and bringing the world closer together depends on people's ability to share diverse views, experiences, ideas and information. We want people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable."

53.     Facebook claims that it maintains some guardrails:

Our commitment to expression is paramount, but we recognize the internet creates new and increased opportunities for abuse. For these reasons, when we limit expression, we do it in service of one or more of the following values:

We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments:

**Who can use Facebook?**

When people stand behind their opinions and actions, our community is safer and more accountable. For this reason, you must:

- Use the same name that you use in everyday life.
- Provide accurate information about yourself.
- Create only one account (your own) and use your timeline for personal purposes.
- Not share your password, give access to your Facebook account to others, or transfer your account to anyone else (without our permission).

We try to make Facebook broadly available to everyone, but you cannot use Facebook if: You are under 13 years old.

You are a convicted sex offender.

We've previously disabled your account for violations of our Terms or Policies. You are prohibited from receiving our products, services, or software under applicable laws.

**Authenticity:** We want to make sure the content people are seeing on Facebook is authentic. We believe that authenticity creates a better environment for sharing, and that's why we don't want people using Facebook to misrepresent who they are or what they're doing.

**Safety:** We are committed to making Facebook a safe place. Expression that threatens people has the potential to intimidate, exclude or silence others and isn't allowed on Facebook.

**Privacy:** We are committed to protecting personal privacy and information. Privacy gives people the freedom to be themselves, and to choose how and when to share on Facebook and to connect more easily.

**Dignity:** We believe that all people are equal in dignity and rights. We expect that people will respect the dignity of others and not harass or degrade others.

Facebook Community Standards, https://www.facebook.com/communitystandards (emphasis in original).

54.     Facebook warns that the "consequences for violating our Community Standards vary depending on the severity of the violation and the person's history on the platform. For instance, we may warn someone for a first violation, but if they continue to violate our policies, we may restrict their ability to post on Facebook or disable their profile. We also may notify law enforcement when we believe there is a genuine risk of physical harm or a direct threat to public safety." *Id.*

55.     Further, Facebook's current Terms of Service state,

We can remove or restrict access to content that is in violation of these provisions. ***If we remove content that you have shared in violation of our Community Standards, we'll let you know and explain any options that you have to request another review***, unless you seriously or repeatedly violate these Terms or if doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

(Facebook Terms and Conditions, attached to Defendants' Preliminary Objections to First Amended Complaint) (emph. added).

56.     Further, the current Terms of Service provide for certain procedures in the event Facebook suspends or terminates an account:

> Where we take such action we'll let you know and explain any options you have to request a review unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems, or Products; or where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

(Facebook Terms and Conditions, attached to Defendants' Preliminary Objections to First Amended Complaint).

**C.     Armslist's, Mr. Gibbon's, and Mr. Varney's Use of Facebook**

57.     Beginning in 2007, Armslist, Mr. Gibbon, and Mr. Varney began using Facebook to communicate with friends, family, and potential users of Armslist.

58.     Such communication sometimes took the form of direct advertising, but was more often geared towards customer engagement.  For example, Armslist would post comments, links, videos, photos, and messages that it believed would appeal to its current and potential users.  Using Facebook as a means to exchange messages with its users and potential users, and allowing those potential Armslist users to interact with the business and Mr. Gibbon, created an affinity between Armslist and its users.

59.     Significantly, at no time did Armslist, Mr. Gibbon, or Mr. Varney use or seek to use Facebook as a medium for the sale or exchange of firearms.  Nor did Armslist, Mr. Gibbon, or Mr. Varney arrange or seek to arrange any sale or trade of firearms by third parties through Facebook's platform. Rather, Armslist's presence on Facebook was designed to voice its strongly held opinions on firearms and related issues, and to build affinity and name recognition with potential Armslist users.

60.     Armslist frequently posted commentary supportive of Second Amendment rights and critical of certain proposed gun control measures and the political figures supporting these

12/02/2021 09:05 PM Westmoreland County   21CI03063

measures. In addition, many of Armslist's posts called attention to the use of firearms in stopping and preventing crime, the significance of firearms in American history and culture, and the constitutional protections relating to firearm ownership.

61.     These messages were expressly political, making political arguments about specific initiatives and proposals regarding firearm regulation and the political actors who support them, as well as more general statements reflecting Armslist's conservative and libertarian attitudes towards firearms.

62.     Because Mr. Gibbon's and Mr. Varney's personal political views run towards the conservative and libertarian side of the political spectrum, both their and Armslist's posts often argue for conservative or libertarian political positions, particularly on issues relating to firearms. Not surprisingly, the political views of potential Armslist users generally appear similar to those held by Mr. Gibbon and Mr. Varney.

63.     Facebook users who do not wish to see Armslist's posts—or personal posts from Mr. Gibbon or Mr. Varney—can easily avoid seeing them. Facebook only permits individuals who have voluntarily "friended" another person or "followed" a business page to receive posts from that person or business. Further, persons who decide that they no longer wish to see Armslist's posts can "unfriend," "block," "unfollow," or temporarily pause receiving posts from Armslist or any individual.  See Facebook Terms of Use and Community Standards.

64.     In their use of Facebook, Armslist, Mr. Gibbon, and Mr. Varney abided by Facebook's Terms and Conditions and adhered to Facebook's Community Standards.

**D.     Torquelist's Use of Facebook**

65.     Torquelist.com is an online platform created by Torquelist, LLC, that allows third parties to communicate regarding buying, selling, and trading cars, trucks, and automotive parts and accessories.

66.     Like Armslist, Torquelist is wholly owned by Mr. Gibbon.

67.     Also, like Armslist, Torquelist used Facebook starting around 2013 to communicate with potential users of its service. Torquelist typically posted comments, links, and photos relating to automotive performance, including car and truck reviews, industry news, and other items that would be of interest to auto enthusiasts.

68.     Unlike Armslist, however, Torquelist did not post any comments, links or other material relating to firearms, the Second Amendment, or State or Federal policy related to them. In its use of Facebook, Torquelist abided by Facebook's Terms and Conditions and adhered to Facebook's Community Standards.

**E.       Facebook Bans Armslist, Mr. Gibbon, and Mr. Varney**

69.     On January 16, 2020, Facebook banned Mr. Gibbon by locking Mr. Gibbon's personal account from all further posting, alleging nonspecific violations of its terms and conditions.  Facebook later deleted Mr. Gibbon's personal account. Facebook never identified what provision of its terms and conditions Mr. Gibbon allegedly violated.

70.     On January 17, 2020, Facebook banned Armslist by removing Armslist's business page, alleging nonspecific violations of its terms and conditions, thereby preventing Armslist employees and contractors from posting and visitors from viewing the business page content. Facebook never identified what provision of its terms and conditions Armslist allegedly violated.

71.     Further, Facebook instituted a policy preventing users from sending the "armslist.com" URL in private messages.

20

12/02/2021 09:05 PM Westmoreland County   21CI03063

72.     Around September 2020, Facebook banned Mr. Varney by locking Mr. Varney's personal account from all further posting, alleging nonspecific violations of its terms and conditions.  Facebook never identified what provision of its terms and conditions Mr. Varney allegedly violated.

73.     Mr. Gibbon's and Mr. Varney's accounts have been deleted and Armslist's business page has been removed since that time, meaning that neither Armslist nor Mr. Gibbon or Mr. Varney can use the service to communicate or express any opinion.

74.     Mr. Gibbon, Mr. Varney, and Armslist have requested additional information from Facebook in an attempt to determine the nature of the alleged violation.

75.     Facebook, however, has not responded to Mr. Gibbons', Mr. Varney's, or Armslist's requests, nor otherwise provided any information regarding the nature of the Plaintiffs' alleged violations.

76.     In 2014 and 2018, Armslist was named as a defendant in two lawsuits.  The suits alleged that Armslist was liable for injuries and death caused by the criminal actions of others who had allegedly purchased firearms illegally through the Armslist platform. See *Vesely v. Armslist LLC*, 762 F.3d 661 (7th Cir. 2014); *Daniel v. Armslist*, 386 Wis.2d 449 (Wis. 2019); *Stokinger v. Armslist LLC*, 2020 WL 2617168 (Mass. Superior Ct.).

77.     Both suits were eventually dismissed based:  *Vesely*, because Armslist owed no duty to plaintiff; *Daniel*, because of Sec. 230 of the 1996 Communications Decency Act, which prevents platform operators such as Armslist from being treated as a publisher or speaker of any information provided by another information content provider.

78.     These suits, however, attracted national attention, making Armslist a prominent target of gun regulation proponents. For example, in the *Vesely* case, there were numerous amicus

12/02/2021 09:05 PM Westmoreland County   21CI03063

curiae briefs filed, including one by members of Congress arguing that Armslist should be held liable. See *Vesely*, Docket, ECF No. 24-1. Likewise, when the plaintiff sought certiorari from the Wisconsin Supreme Court's decision in *Daniel*, numerous amici filed briefs in support of certiorari. Some of these briefs charged Armslist with "facilitating" multiple gun-related deaths. See *Daniel*, U.S. Supreme Court, Case No. 19-153, Brief of Amici Cyber Civil Rights Initiative and Legal Scholars in Support of Petitioners, 25-27, and made baseless inflammatory claims that "Armslist designed its website with the goal of circumventing mandatory background checks and other state measures concerning firearm sales and protection of abuse victims," and that "there are likely even more homicides facilitated by Armslist beyond the statistics known to the public." Brief of Amici National Coalition Against Domestic Violence, et al., in Support of Petition for Certiorari, U.S. Supreme Court, Case No. 19-153, 8-10.

79.     Relatedly, Armslist became a target in the progressive media. For example, the website The Verge collaborated with gun control journalism project The Trace to publish an article on January 16, 2020, titled "Armslist: inside the crime-friendly Craigslist of guns." https://www.theverge.com/2020/1/16/21067793/guns-online-armslist-marketplace-craigslist-sales-buy-crime-investigation.

80.     The article was highly critical of Armslist.

81.     In addition, in a February 2021 publication from the University of Virginia, a law professor who filed an amicus brief in support of plaintiff's petition for writ of certiorari in *Daniel*, misleadingly implied that Armslist failed to comply with applicable state and federal laws and falsely claimed that Armslist received a cut of sale proceeds from private transactions advertised on its site.

82.     Also, in early February 2021, the gun-control advocacy organization "Everytown" published a widely cited study claiming that over 10% of purchasers on Armslist would not be able to pass a federal background check required to purchase a gun from a Federal Firearms Licensee. Armslist rejects these conclusions and the methodology of the study.

83.     On information and belief, based on these media accounts and Armslist's prominence in them, Armslist asserts that Facebook's ban was motivated not by any breach of Facebook's terms and conditions by Armslist, Mr. Gibbon, or Mr. Varney, but by mounting media pressure projecting progressive political views.

84.     Similarly, Mr. Gibbon asserts that Facebook's ban was motivated not by any breach of Facebook's terms and conditions by Mr. Gibbon, but by his ownership of Armslist and administration privileges of the Armslist Facebook business page.

85.     Additionally, Mr. Varney asserts that Facebook's ban was motivated not by any breach of Facebook's terms and conditions by Mr. Varney, but by his association with Armslist and administration privileges of the Armslist business page. In addition to media pressure seeking limits on Second Amendment rights, as well as on the freedom to speak in opposition to such limits, members of Congress have, since 2013, pressured Facebook regarding its treatment of ads and posts dealing with firearms.  That pressure has recently increased.

86.     For example, in November of 2013, Senator Edward Markey sent a letter to Mark Zuckerberg, founder and CEO of Facebook, complaining "I remain deeply concerned that gun sales on Facebook and Instagram — or sales posted online but negotiated and concluded offline — may circumvent or violate state and federal laws, resulting in numerous unlawful sales of handguns, assault weapons, and other firearms.  We want all communities, whether online or offline, to be safe for their members. **I continue to urge Facebook and Instagram to adopt safe**

business practices and prohibit postings for firearms sales."
https://www.markey.senate.gov//imo/media/doc/2016-07-13-Letter-Facebook-Instagram-
GunSales.pdf (*Emphasis in original*).  In February of 2020**,** thirteen U.S. Senators sent a letter to
Zuckerberg specifically aimed at sites like Armslist, indicating that "it is not enough to simply ban
[direct gun] sales. Effective monitoring, including the suspension of accounts in violation of these
policies, is essential."   https://www.documentcloud.org/documents/6788567-Facebook-Private-
Group-Gun-Sale-Letter.html.  The Senators demanded to know "[w]hat measures does Facebook
have in place to ensure that if it permanently suspends a private group for violating the gun sale
policy, users from that group cannot create another private group under a different name?" and
"[w]hat proactive measures is Facebook taking to ensure that users in private groups are not able
to skirt Facebook's ban on gun sales, including referring potential buyers to apps such as
WhatsApp, Snapchat, Wickr, or any alternative communication platform?" Id.

87.    More recently, on March 8, 2021, 23 members of Congress sent a letter to
Zuckerberg demanding that Facebook "immediately examine its advertising practices and makes
substantive changes to its policies to avoid future instances of [firearm] ad placements and
targeting that promote violence."
https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/
Facebook%20Letter%20re%20Advertising%20Practices%202021.pdf.

88.    Further, on August 19, 2021, three weeks after this suit was originally filed, Senator
Diane Feinstein, along with Senator Sheldon Whitehouse, and Richard Blumenthal issued a press
statement announcing legislation specifically directed at Armslist. See
https://www.feinstein.senate.gov/public/index.cfm/press-
releases?ContentRecord_id=37C0EDEB-46DB-4145-A1BD-07A58369D18.

12/02/2021 09:05 PM Westmoreland County   21CI03063

89.     According to the press release, the new legislation "would ensure that websites like Armslist no longer enjoy blanket immunity under Section 230 of the Communications Decency Act, and can be brought to justice for violations of the law."  Id.

90.     The press release falsely alleges that "Armslist and its competitors have become rife with illegal and dangerous gun sales . . . . " Id.

91.     A press release announcing legislation aimed a specific company is remarkable and evidences the government animus against Armslist.

92.     Senator Feinstein, who sits in a position to regulate Facebook and its own access to immunity under Section 230 of the Communications Decency Act has harshly criticized Facebook for failing to censor posts and has threatened more robust federal regulation of Facebook if it fails to provide the censorship that she deems appropriate.  See, e.g., Joe Garafoli, *Feinstein to Facebook: 'Fix it' Before the Feds Do it For You*, SAN FRANCISCO CHRONICLE (Apr. 2, 2018) https://www.sfchronicle.com/politics/article/Feinstein-to-Facebook-Fix-it-before-the-12800274.php.

93.     Likewise, Senator Whitehouse has stated that he wants to know "how [Facebook] plan[s] to prevent bad actors from using ads to secretly spread misinformation."   See https://twitter.com/SenWhitehouse/status/1369335067177345032.

94.     The recent press release, taken in the context of the Senators' power to regulate Facebook and their demands that Facebook take steps to "Fix it" and prevent "bad actors" from spreading "misinformation" amounts to government attempting to regulate speech indirectly by making known whom the Senators deem to be "bad actors."

95.     As Justice Thomas noted in his *Knight* concurrence, although a "'private entity is not ordinarily constrained by the First Amendment,' *Halleck*, 587 U. S., at ___, (Slip op., at 6, 9),

25

if the government coerces or induces it to take an action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint. *Ibid.* Consider government threats. 'People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around.' *Bantam Books, Inc. v. Sullivan*, 372 U. S. 58, 68 (1963). The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly. See *ibid.*; *Blum v. Yaretsky*, 457 U. S. 991, 1004–1005 (1982). Under this doctrine, plaintiffs might have colorable claims against a digital platform if it took adverse action against them in response to government threats." *Knight*, 141 S.Ct. at 1226 (Thomas, J., concurring).

### F.  Facebook Bans Torquelist

96.  On January 17, 2020, Facebook banned Torquelist by removing Torquelist's business page, alleging nonspecific violations of its terms and conditions, thereby preventing Torquelist employees and contractors from posting and visitors from viewing the business page content.

97.  Torquelist has requested additional information from Facebook in an attempt to determine the nature of the alleged violation.

98.  Facebook, however, has not responded or otherwise provided any information regarding the nature of the Plaintiff's alleged violation. Facebook never identified what provision of its terms and conditions Torquelist allegedly violated.

99.  Torquelist asserts that Facebook's ban was motivated not by any breach of Facebook's terms and conditions by Torquelist, but by the fact that Torquelist shares common ownership with Armslist and some of the persons designated as Armslist business page administrators were likewise designated as administrators of the Torquelist business page.

26

12/02/2021 09:05 PM Westmoreland County   21CI03063

### G.      Instagram Creates a Public Platform for Speech

100.      Instagram launched in 2010 as a social media platform that allows users to share comments, photos, videos, weblinks and other information with other Instagram users who have chosen to receive such posts ("Followers").

101.      Instagram allows businesses to maintain "business accounts", whereby the businesses can communicate with their customers.

102.      Instagram holds itself out as a public forum where people and businesses can share ideas and connect with one another.  For example, Instagram's Terms of Use state:

> The Service includes all of the Instagram products, features, applications, services, technologies, and software that we provide to advance Instagram's mission: To bring you closer to the people and things you love. The Service is made up of the following aspects:
>
> **Offering personalized opportunities to create, connect, communicate, discover, and share.**
>
> People are different. We want to strengthen your relationships through shared experiences you actually care about. So we build systems that try to understand who and what you and others care about, and use that information to help you create, find, join, and share in experiences that matter to you. Part of that is highlighting content, features, offers, and accounts you might be interested in, and offering ways for you to experience Instagram, based on things you and others do on and off Instagram.
>
> **Fostering a positive, inclusive, and safe environment.**
>
> We develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive, including when we think they might need help. We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have - including your information - to try to keep our platform secure. We also may share information about misuse or harmful content with other Facebook Companies or law enforcement. Learn more in the Data Policy.
>
> **Developing and using technologies that help us consistently serve our growing community.**
> Organizing and analyzing information for our growing community is central to our Service. A big part of our Service is creating and using cutting-edge technologies that help us personalize, protect, and improve our Service on an incredibly large scale for a broad global community. Technologies like artificial intelligence and machine

learning give us the power to apply complex processes across our Service. Automated technologies also help us ensure the functionality and integrity of our Service.

**Providing consistent and seamless experiences across other Facebook Company Products.**

Instagram is part of the Facebook Companies, which share technology, systems, insights, and information - including the information we have about you (learn more in the Data Policy) in order to provide services that are better, safer, and more secure. We also provide ways to interact across the Facebook Company Products that you use, and designed systems to achieve a seamless and consistent experience across the Facebook Company Products.

**Ensuring access to our Service.**

To operate our global Service, we must store and transfer data across our systems around the world, including outside of your country of residence. The use of this global infrastructure is necessary and essential to provide our Service. This infrastructure may be owned or operated by Facebook Inc., Facebook Ireland Limited, or their affiliates.

**Connecting you with brands, products, and services in ways you care about.**

We use data from Instagram and other Facebook Company Products, as well as from third-party partners, to show you ads, offers, and other sponsored content that we believe will be meaningful to you. And we try to make that content as relevant as all your other experiences on Instagram.
**Research and innovation.**

We use the information we have to study our Service and collaborate with others on research to make our Service better and contribute to the well-being of our community.

(Instagram Terms of Use, https://help.instagram.com/581066165581870, accessed 7-12-21).

103.    Similarly, Instagram's Community Guidelines reaffirm its commitment to providing a forum for users to express themselves.   Indeed, a subsection of Instagram's Community Guidelines entitled "The Short" states, "We want Instagram to continue to be an authentic and safe place for inspiration and expression."

104.    Instagram states that "Instagram is a reflection of our diverse community of cultures, ages, and beliefs. We've spent a lot of time thinking about the different points of view that create a safe and open environment for everyone.  In some cases, we allow content for public awareness which would otherwise go against our Community Guidelines – if it is newsworthy and in the public interest. We do this only after weighing the public interest value against the risk of harm and we look to international human rights standards to make these judgments."

(Instagram          Community          Guidelines,          https://help.instagram.com/4774341 05621119/?helpref=hc_fnav&bc[0]=Instagram%20Help&bc[1]=Policies%20and%20Reporting, accessed 7-21-21).

105.    Instagram claims that it maintains some guardrails, as outlined in its current Terms of Use:

In return for our commitment to provide the Service, we require you to make the below commitments to us.

**Who Can Use Instagram.** We want our Service to be as open and inclusive as possible, but we also want it to be safe, secure, and in accordance with the law. So, we need you to commit to a few restrictions in order to be part of the Instagram community.

- You must be at least 13 years old.
- You must not be prohibited from receiving any aspect of our Service under applicable laws or engaging in payments related Services if you are on an applicable denied party listing.
- We must not have previously disabled your account for violation of law or any of our policies.
- You must not be a convicted sex offender.

(Instagram Terms of Use).

106.    Instagram warns that, "We can remove any content or information you share on the Service if we believe that it violates these Terms of Use, our policies (including our Instagram Community Guidelines), or we are permitted or required to do so by law. We can refuse to provide or stop providing all or part of the Service to you (including terminating or disabling your access

to the Facebook Products and Facebook Company Products) immediately to protect our community or services, or if you create risk or legal exposure for us, violate these Terms of Use or our policies (including our Instagram Community Guidelines), if you repeatedly infringe other people's intellectual property rights, or where we are permitted or required to do so by law. We can also terminate or change the Service, remove or block content or information shared on our Service, or stop providing all or part of the Service if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts on us." Id.

107.    Instagram's current terms, much like Facebook's, disclose that Instagram collects and exploits user information:

**How Our Service Is Funded**

Instead of paying to use Instagram, by using the Service covered by these Terms, you acknowledge that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.

We should you relevant and useful ads without telling advertisers who you are. We don't sell your personal data.  We allow advertisers to tell us things like their business goal and the kind of audience they want to see their ads.  We then show their ad to people who might be interested.

We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Instagram.  For example, we provide general demographic and interest information to advertisers to help them better understand their audience.  We don't share information that directly identifies you…unless you give us specific permission…

[…]

**The Data Policy**

Providing our Service requires collecting and using your information.  The Data Policy explains how we collect, use, and share information across the Facebook Products. It also explains the many ways you can control your information, including the Instagram Privacy and Security Settings.  You must agree to the Data Policy to use Instagram.

(Instagram Terms of Use, attached to Defendants' Preliminary Objections to First Amended Complaint).

### H.    Armslist's, Mr. Gibbon's, and Mr. Varney's Use of Instagram

108.    Around 2012-2013, Armslist, Mr. Gibbon, and Mr. Varney began using Instagram to communicate with friends, family, and potential users of Armslist.

109.    Such communication sometimes took the form of direct advertising, but was more often geared towards customer engagement.  For example, Armslist would post comments, links, videos, photos, and messages that it believed would appeal to its current and potential users.  Using Instagram as a means to exchange messages with its users and potential users, and allowing those potential Armslist users to interact with the business Mr. Gibbon, and Mr. Varney, created an affinity between Armslist and its users.

110.    Significantly, at no time did Armslist, Mr. Gibbon, or Mr. Varney use or seek to use Instagram as a medium for the sale or exchange of firearms.  Nor did Armslist, Mr. Gibbon, or Mr. Varney arrange or seek to arrange any sale or trade of firearms by third parties through Instagram's platform. Rather, Armslist's presence on Instagram was designed to voice its strongly held opinions on firearms and related issues and to build affinity and name recognition with potential Armslist users.

111.    Thus, before the Armslist business account was functionally degraded, locked, and removed by Instagram, Armslist frequently posted commentary supportive of Second Amendment rights and critical of certain proposed gun control measures and the political figures supporting these measures.  In addition, many of Armslist's posts called attention to the use of firearms in stopping and preventing crime, the significance of firearms in American history and culture, and the constitutional protections relating to firearm ownership.

12/02/2021 09:05 PM Westmoreland County   21CI03063

112.    These messages were expressly political, making political arguments about specific initiatives and proposals regarding firearm regulation and the political actors who support them, as well as more general statements reflecting Armslist's conservative and libertarian attitudes towards firearms.

113.    Because Mr. Gibbon's and Mr. Varney's personal political views run towards the conservative and libertarian side of the political spectrum, both their and Armslist's posts often argue for conservative or libertarian political positions, particularly on issues relating to firearms. Not surprisingly, the political views of potential Armslist users generally appear similar to those held by Mr. Gibbon and Mr. Varney.

114.    Instagram users who do not wish to see Armslist's posts—or personal posts from Mr. Gibbon or Mr. Varney—can easily avoid seeing them. In the first place, Instagram only permits individuals who have voluntarily "followed" another personal or business account to receive that person or business's posts. Further, persons who decide that they no longer wish to see Armslist's posts can "block" or "unfollow" Armslist or any individual to avoid seeing those posts.  See Instagram Community Guidelines.

115.    In their use of Instagram, Armslist, Mr. Gibbon, and Mr. Varney abided by Instagram's Terms of Use and adhered to Instagram's Community Guidelines.

I.    **Torquelist's Use of Instagram**

116.    Torquelist.com is an online platform created by Torquelist, LLC, that allows third parties to communicate regarding buying, selling, and trading cars, trucks, and automotive parts and accessories.

117.    Like Armslist, Torquelist is wholly owned by Mr. Gibbon.

12/02/2021 09:05 PM Westmoreland County   21CI03063

118.    Also, like Armslist, Torquelist commenced using Instagram starting around 2013 to communicate with potential users of its service. Torquelist typically posts comments, links, and photos relating to automotive performance, including car and truck reviews, industry news, and other items that would be of interest to auto enthusiasts.

119.    Unlike Armslist, however, Torquelist has not posted any comments, links or other material relating to firearms, the Second Amendment, or State or Federal policy related to them. In its use of Instagram, Torquelist has abided by Instagram's Terms of Use and adhered to Instagram's Community Guidelines.

**J.    Instagram Bans Armslist, Mr. Gibbon, and Mr. Varney**

120.    On January 16, 2020, Instagram banned Mr. Gibbon by locking Mr. Gibbon's personal account from all further posting.  Instagram refused to inform Mr. Gibbon as to why his personal account was banned. Instagram never identified what provision of its terms and conditions Mr. Gibbon allegedly violated.

121.    Later in 2020, Instagram banned Mr. Gibbon by deleting Mr. Gibbon's personal account.  Instagram refused to inform Mr. Gibbon as to why his personal account was banned.

122.    On January 16, 2020, Instagram banned Armslist by locking Armslist's business account from all further posting, thereby preventing Armslist employees from posting and visitors from viewing new business account content.  Instagram refused to inform Armslist as to why the business account was banned. Facebook never identified what provision of its terms and conditions Armslist allegedly violated.

123.    Later in January 2020, Instagram restored only limited functionality of the Armslist business account, thereby preventing Armslist employees from fully posting and visitors from

viewing full features business account content.  Instagram refused to inform Armslist as to why the business account functionality was limited.

124.    Later in 2020, Instagram banned Armslist by deleting Armslist's business account. Instagram refused to inform Armslist as to why the business account was banned.

125.    Around September 2020, Instagram banned Mr. Varney by locking Mr. Varney's personal account from all further posting.  Instagram refused to inform Mr. Varney as to why his personal account was banned. Instagram never identified what provision of its terms and conditions Mr. Varney allegedly violated.

126.    Later in 2020, Instagram banned Mr. Varney by deleting Mr. Varney's personal account.  Instagram refused to inform Mr. Varney as to why his personal account was banned.

127.    Armslist's, Mr. Gibbon's and Mr. Varney's accounts have been deleted, meaning that neither Armslist nor Mr. Gibbon or Mr. Varney can use the service to communicate or express any opinion.

128.    Mr. Gibbon, Mr. Varney, and Armslist have requested additional information from Instagram in an attempt to determine the nature of the alleged violation.

129.    Instagram, however, has not responded or otherwise provided any information regarding the nature of the Plaintiffs' alleged violation.

130.    In 2014 and 2018, Armslist was named as a defendant in two lawsuits.  The suits alleged that Armslist was liable for injuries and death caused by the criminal actions of others who had allegedly purchased firearms illegally through the Armslist platform. See *Vesely v. Armslist LLC*, 762 F.3d 661 (7th Cir. 2014); *Daniel v. Armslist*, 386 Wis.2d 449 (Wis. 2019); *Stokinger v. Armslist LLC*, 2020 WL 2617168 (Mass. Superior Ct.).

131.    Both suits were eventually dismissed based: *Vesely*, because Armslist owed no duty to plaintiff; *Daniel*, because of Sec. 230 of the 1996 Communications Decency Act, which prevents platform operators such as Armslist from being treated as a publisher or speaker of any information provided by another information content provider.

132.    These suits, however, attracted national attention, making Armslist a prominent target of proponents of gun regulation proponents. For example, in the *Vesely* case, there were numerous amicus curiae briefs filed, including one by members of Congress arguing that Armslist should be held liable. See *Vesely*, Docket, ECF No. 24-1. Likewise, when the plaintiff sought certiorari from the Wisconsin Supreme Court's decision in *Daniel*, numerous amici filed briefs in support of certiorari.   Some of these briefs charged Armslist with "facilitating" multiple gun-related deaths. See *Daniel*, U.S. Supreme Court, Case No. 19-153, Brief of Amici Cyber Civil Rights Initiative and Legal Scholars in Support of Petitioners, 25-27, and made baseless inflammatory claims that "Armslist designed its website with the goal of circumventing mandatory background checks and other state measures concerning firearm sales and protection of abuse victims," and makes unfounded allegations that "there are likely even more homicides facilitated by Armslist beyond the statistics known to the public."  Brief of Amici National Coalition Against Domestic Violence, et al., in Support of Petition for Certiorari, U.S. Supreme Court, Case No. 19-153, 8-10.

133.    Relatedly, Armslist became a target in the progressive media.  For example, the website The Verge collaborated with gun control journalism project The Trace to publish an article on January 16, 2020, titled "Armslist: inside the crime-friendly Craigslist of guns." https://www.theverge.com/2020/1/16/21067793/guns-online-armslist-marketplace-craigslist-sales-buy-crime-investigation.

12/02/2021 09:05 PM Westmoreland County   21CI03063

134.    The article was highly critical of Armslist.

135.    In addition, in a February 2021 publication from the University of Virginia, a law professor who filed an amicus brief in support of plaintiff's petition for writ of certiorari in *Daniel*, misleadingly implied that Armslist failed to comply with applicable state and federal laws and falsely claimed that Armslist received a cut of sale proceeds from private transactions advertised on its site.

136.    Also, in early February 2021, the gun-control advocacy organization "Everytown" published a widely cited study claiming that over 10% of purchasers on Armslist would not pass a federal background check required to purchase a gun from a Federal Firearms Licensee. Armslist rejects these conclusions and the methodology of the study.

137.    On information and belief, based on these media accounts and Armslist's prominence in them, Armslist asserts that Instagram's ban was motivated not by any breach of Instagram's terms and guidelines by Armslist, Mr. Gibbon, or Mr. Varney but by mounting media pressure projecting progressive political views.

138.    In addition to the media pressure seeking limits on Second Amendment rights, as well as on the freedom to speak in opposition to such limits, members of Congress have, since 2013, pressured Instagram regarding its treatment of ads and posts dealing with firearms.  That pressure has recently increased.

139.    For example, in November of 2013, Senator Edward Markey sent a letter to Mark Zuckerberg, founder and CEO of Facebook, parent company of Instagram, complaining "I remain deeply concerned that gun sales on Facebook and Instagram — or sales posted online but negotiated and concluded offline — may circumvent or violate state and federal laws, resulting in numerous unlawful sales of handguns, assault weapons, and other firearms. We want all

communities, whether online or offline, to be safe for their members. **I continue to urge Facebook and Instagram to adopt safe business practices and prohibit postings for firearms sales."**https://www.markey.senate.gov

//imo/media/doc/2016-07-13-Letter-Facebook-Instagram-GunSales.pdf (*Emphasis in original*). In February of 2020**,** thirteen U.S. Senators sent a letter to Zuckerberg specifically aimed at sites like Armslist, indicating that "it is not enough to simply ban [direct gun] sales. Effective monitoring, including the suspension of accounts in violation of these policies, is essential." https://www.documentcloud.org/documents/6788567-Facebook-Private-Group-Gun-Sale-Letter.html. The Senators demanded to know "[w]hat measures does Facebook have in place to ensure that if it permanently suspends a private group for violating the gun sale policy, users from that group cannot create another private group under a different name?" and "[w]hat proactive measures is Facebook taking to ensure that users in private groups are not able to skirt Facebook's ban on gun sales, including referring potential buyers to apps such as WhatsApp, Snapchat, Wickr, or any alternative communication platform?" Id.

140.    More recently, on March 8, 2021, 23 members of Congress sent a letter to Zuckerberg demanding that Facebook "immediately examine its advertising practices and makes substantive changes to its policies to avoid future instances of [firearm] ad placements and targeting that promote violence." (https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Facebook%20Letter%20re%20Advertising%20Practices%202021.pdf).

141.    Further, on August 19, 2021, three weeks after this suit was originally filed, Senator Diane Feinstein, along with Senator Sheldon Whitehouse, and Richard Blumenthal issued a press statement announcing legislation specifically directed at Armslist. See

12/02/2021 09:05 PM Westmoreland County   21CI03063

https://www.feinstein.senate.gov/public/index.cfm/press-

releases?ContentRecord_id=37C0EDEB-46DB-4145-A1BD-07A58369D18.

142.    According to the press release, the new legislation "would ensure that websites like Armslist no longer enjoy blanket immunity under Section 230 of the Communications Decency Act, and can be brought to justice for violations of the law."  Id.

143.    The press release falsely alleges that "Armslist and its competitors have become rife with illegal and dangerous gun sales . . . . " Id.

144.    A press release announcing legislation aimed a specific company is remarkable and evidences the government animus against Armslist.

145.    Senator Feinstein, who sits in a position to regulate Facebook and its own access to immunity under Section 230 of the Communications Decency Act has harshly criticized Facebook for failing to censor posts and has threatened more robust federal regulation of Facebook if it fails to provide the censorship that she deems appropriate.  See, e.g., Joe Garafoli, *Feinstein to Facebook: 'Fix it' Before the Feds Do it For You*, SAN FRANCISCO CHRONICLE (Apr. 2, 2018) https://www.sfchronicle.com/politics/article/Feinstein-to-Facebook-Fix-it-before-the-12800274.php.

146.    Likewise, Senator Whitehouse has stated that he wants to know "how [Facebook] plan[s] to prevent bad actors from using ads to secretly spread misinformation."  See https://twitter.com/SenWhitehouse/status/1369335067177345032.

147.    The recent press release, taken in the context of the Senators' power to regulate Facebook and their demands that Facebook take steps to "Fix it" and prevent "bad actors" from spreading "misinformation" amounts to government attempting to regulate speech indirectly by making known whom the Senators deem to be "bad actors."

148.    As Justice Thomas noted in his *Knight* concurrence, although a "'private entity is not ordinarily constrained by the First Amendment,' *Halleck*, 587 U. S., at ___, (Slip op., at 6, 9), it is if the government coerces or induces it to take an action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint. Ibid. Consider government threats. 'People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around.' *Bantam Books, Inc. v. Sullivan*, 372 U. S. 58, 68 (1963). The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly. See ibid.; *Blum v. Yaretsky*, 457 U. S. 991, 1004–1005 (1982). Under this doctrine, plaintiffs might have colorable claims against a digital platform if it took adverse action against them in response to government threats."   *Knight*, 141 S.Ct. at 1226 (Thomas, J., concurring).

### K.    Instagram Limits Visibility of Torquelist Account

149.    Since around January 16, 2020, the Torquelist Instagram account has experienced a decrease in visitor and follower traffic and interaction.

150.    This decrease in visitor and follower traffic and interaction on Torquelist's Instagram account continued through the COVID lockdowns and continues at the time of filing, despite the fact that Instagram's users increased by over 13 million – a 30% increase – during 2020.  https://www.theartnewspaper.com/analysis/visitor-figures-social-media-museums.

151.    Torquelist asserts that this decrease in visitor and follower traffic and interaction on Torquelist's Instagram account can only be explained by Instagram's algorithms limiting the visibility of Torquelist's Instagram account and posts to Torquelist's Instagram followers and other Instagram users who may be interested in the content of Torquelist's posts on Instagram.

152.    Torquelist asserts that Instagram's limiting the visibility of the Torquelist account is motivated not by any breach of Instagram's Terms of Use or Community Guidelines by Torquelist, but by the fact that Torquelist shares common ownership with Armslist and some of the persons who administered the Armslist Instagram account are likewise designated as administrators of the Torquelist Instagram account.

**L.      Plaintiffs' Rights Under the Pennsylvania Constitution**

153.    Pennsylvania's Constitution provides that "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. Art. 1, § 1.

154.    More specifically to the case at hand, the free speech guarantee set forth in Pennsylvania's Constitution is broader than the First Amendment's:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.  Const. Pa. Art 1, §

155.    The Pennsylvania Supreme Court has recognized that Pennsylvania's guarantees of free speech and expression exceed those of the U.S. Constitution in that they are positive rights held by the people, and thus may be enforced against non-state actors. See, e.g., *Commonwealth v. Tate*, 49 Pa. 158 (1981).

156.    In *Tate*, the Pennsylvania Supreme Court held that a private college, even though it was private property, had made itself a public forum for debate on means of reducing crime, and specifically asked the public to appear and comment. Having done so, the college could not discriminate against a particular point of view.

12/02/2021 09:05 PM Westmoreland County    21CI03063

157.     Here, Instagram has made itself a public forum through the varied and many promises it has made, and continues to make, to the public in its Terms of Use and Community Guidelines.

158.     Not only does Instagram invite the public at large to come on to its virtual property and express themselves on various topics, including political topics, but Instagram's business model is built on that invitation.

159.     Further, even if this court does not apply the *Tate* decision's recognition that the Pennsylvania Constitution's free speech and expression provisions apply to private entities, in this case, members of the United States Congress have made their expectations of Instagram clear: either censor speech of which the members disapprove—like the views expressed by Armslist— or face costly and intrusive legislation. Instagram's behavior in response to these "thinly veiled threats" evinces its having acceded to executing the government's desires, which the government itself may not effectuate under the United States Constitution. This renders Instagram a state actor. See, e.g. *Norwood v. Harrison,* 413 U.S. 455, 464, 93 S. Ct. 2804, 37 L.Ed.2d 723 (1973)(the government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") In other words, state actors cannot threaten or cajole Instagram into censoring posts without implicating state action.

160.     Similarly, Instagram has made itself a public forum through its various promises in its Terms of Use and Community Guidelines.

161.     Not only does Instagram invite the public at large to come on to its virtual property and express themselves on various topics, including political topics, but Instagram's business model is built on that invitation.

12/02/2021 09:05 PM Westmoreland County   21CI03063

162.    Further, even if the court did not apply the Tate court's recognition that the Pennsylvania Constitution's free speech and expression provisions apply to private entities, in this case, the agents of the federal government, particularly members of Congress have made their intentions clear to Instagram:  Either censor speech of which we disapprove—like Armslist—or face costly and intrusive regulation. Thus, Instagram has been enlisted by the government to engage in censorship and must be treated as a state actor. See, e.g. *Norwood v. Harrison,* 413 U.S. 455, 464, 93 S. Ct. 2804, 37 L.Ed.2d 723 (1973) (the government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") In other words, the state actors cannot threaten or cajole Instagram into censoring posts without implicating state action.

**M.    Defendants concede their relationships with Plaintiffs sound in contract— despite attaching the wrong contracts to their Preliminary Objections to the First Amended Complaint.**

163.    In response to Plaintiffs' First Amended Complaint filed September 1, 2021 ("FAC"), Defendants attached copies of purported contracts between Facebook and Plaintiffs ("alleged Facebook Contract") and Instagram and Plaintiffs ("alleged Instagram Contract"). However, both Contracts *post*-date the events alleged in the FAC.  Specifically, the alleged Facebook Contract is dated October 22, 2020; the alleged Instagram Contract is dated December, 20, 2020. As such neither alleged Contract governs the issues in this dispute.

164.    However, as alleged in detail above, Plaintiffs' relationships with Defendants were in fact governed by contracts drafted *by* Defendants, reflecting the one-sided and adhesive nature of those agreements.  Defendants have just failed to bring the actual contracts governing the parties' relationship to the Court's attention.

21CI03063

12/02/2021 09:05 PM Westmoreland County

165.    Further, Defendants argue in their Preliminary Objections to the FAC, and their supporting brief, Plaintiffs had the opportunity to freely negotiate their contractual relationships with Facebook and Instagram. That is not true.

166.    The only way Plaintiffs could access either Defendant's platform was to agree to the one-side terms included in the contracts drafted by those platforms.  Simply put, there is only one Facebook and there is only one Instagram. If Plaintiffs sought access to those platforms, they had no choice but to accept contractual terms imposed by the Defendants.

**N.    Defendants benefited from their relationship with Plaintiffs by exploiting Plaintiffs' private date and the private date of the other users of Facebook and Instagram that followed Plaintiffs' accounts and pages and interacted with Plaintiffs and their content on those services without upholding Defendants' end of the bargain.**

167.    Both the alleged Facebook Contract and the alleged Instagram Contract demonstrate that both Facebook and Instagram exchanged Plaintiffs' access to their respective platforms for Defendants' use, and exploitation of, the user data derived from Plaintiffs' presence on either platform.

168.    While neither alleged Contract governed at times relevant to Plaintiffs' claims, upon information and belief the actual contracts governing the parties' relationships contained substantively identical terms providing Defendants with use of Plaintiffs' data and the data of users visiting Plaintiffs' Facebook and Instagram pages and accounts.

169.    In exchange, Plaintiffs had the reasonable expectation that, pursuant to the actual contracts, their Facebook and Instagram accounts would not be terminated unless Plaintiffs

violated terms of use and the provisions incorporated by reference in the actual contracts, such as Facebook's community standards.

170.    At no time did Plaintiffs violate the terms of use, or associated governing provisions, that existed at the times relevant to their claims here.

171.    In addition to the reasonable expectation their accounts would not be terminated if they followed Defendants rules—an expectation Plaintiffs' derived from the contracts drafted by Defendants and which Defendants required Plaintiffs to accept in order to use Defendants' platforms—Plaintiffs also had the reasonable expectation that if their accounts on either Facebook or Instagram *were* terminated, suspended, or subject to any adverse decisions by Defendants, Plaintiffs would be provided an explanation, allow Plaintiffs to request a review of the adverse decision, and allow Plaintiffs to contact Defendants if Plaintiffs believed account suspension or termination occurred in error.

172.    At all times, Plaintiffs complied with their obligations under the actual contracts governing their relationships with Defendants.

173.    At all times, Plaintiffs acted in good faith with respect to Defendants and with respect Plaintiffs' obligations to Defendants under the actual contracts.

174.    Despite this, Defendants failed to perform their obligations under the actual contracts in good faith, never explaining their decision to terminate Plaintiffs' accounts and pages, never providing an opportunity to appeal their decisions to do so, and never providing an opportunity to in fact discuss these decisions with either Defendant.

175.    Defendants benefitted from their relationships with Plaintiffs via their use and exploitation of private user data and, when it become expedient to do so, breached their obligations to Plaintiffs by refusing to honor Defendants' obligations.

176.     Specifically, upon information and belief, Defendants perceived they could deflect political pressure, noted *supra* at ¶¶83-85, 78-94, 99, 132-147 and 152, by unilaterally ejecting Second Amendment and firearms related content, as well as non-Second Amendment/firearms content posted by users tangentially associated with the Second Amendment and firearms (*e.g.*, Torquelist's page and account), from their platforms—even where such content did not violate any terms of use, community standards, or other governing provisions.

177.     Contrary to the arguments set forth in Defendants' Preliminary Objections to the FAC, and their supporting brief, the exercise of "good faith" here does not pertain to traditional editorial functions but instead performance of contractual obligations.

178.     That is, the parties had a commercial relationship that obligated Defendants not to unilaterally and in bad faith exorcise Plaintiffs' content from Facebook and Instagram.

### COUNT ONE: ACTION FOR DECLARATORY JUDGMENT
### AND INJUNCTIVE RELIEF

179.     Plaintiffs restate the allegations of Paragraphs 1 through 171 and incorporates them here as if fully rewritten.

180.     42 Pa. Cons. Stat. Ann. § 7541, et seq. provides for an action for a declaratory judgment.

181.     Facebook has prohibited Armslist, Torquelist, Mr. Gibbon, and Mr. Varney from exercising their rights under the Pennsylvania Constitution.

182.     Specifically, Facebook has held itself out as an open public forum, expressly for the purpose of allowing users to speak their minds on any number of topics. This includes political statements relating to firearms and their regulation.

12/02/2021 09:05 PM Westmoreland County    21CI03063

183.    Armslist, Mr. Gibbon, and Mr. Varney have attempted to exercise and continue to seek to exercise their rights by posting their political opinions relating to firearms, firearms regulation, and lawmakers and advocacy groups involved in that debate.

184.    Torquelist has attempted to exercise and continues to seek to exercise its rights by posting its political opinions relating to cars, trucks, automotive regulation and lawmakers and advocacy groups involved in the debate.

185.    Plaintiffs have complied with Facebook's Terms and Conditions and Community Standards and have no information regarding any potential breach of those Terms and Conditions.

186.    Facebook, nevertheless, has censored and banned the Plaintiffs by locking and deleting their accounts and business pages, leaving them unable to comment on firearms, automobiles, or on any other topic on the Facebook platform.

187.    This censorship and ban violate Art. 1, §7 of Pennsylvania's Constitution's guarantee that and "every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

188.    On information and belief, the censorship and ban are politically motivated, and is aimed at quelling criticism of, and potential action against, Facebook by government actors, as well as by certain media and advocacy groups.

189.    Specifically, Armslist has become a visible political target for those advocating stricter gun control and for opponents of the right to bear arms.  Facebook has responded to this political and social criticism by banning Armslist from using Facebook to engage in speech promoting the Second Amendment, fewer firearms restrictions, the importance of firearms in self-defense, and the historical and cultural primacy of firearms in America.

12/02/2021 09:05 PM Westmoreland County    21CI03063

190.    Likewise, Facebook has banned Mr. Gibbon and Mr. Varney and Torquelist from posting to Facebook, violating their rights to free speech and expression because of their association with Armslist and the resulting threat of adverse legislative consequences made by members of Congress.

191.    Plaintiffs therefore seek a declaration that Facebook's actions in locking and deleting their accounts and business pages violates the Pennsylvania Constitution.

192.    Plaintiffs further state that their inability to exercise their constitutional rights of speech and expression constitute existing and continuing irreparable harm for which there is no legal remedy.

193.    Plaintiffs therefore request that the Court provide equitable relief in the form of an injunction enjoining Facebook from continuing to lock the Plaintiffs' accounts or otherwise bar them from participating in the national debate on firearms policy on Facebook's public platform.

194.    Similarly, Instagram has prohibited Armslist, Mr. Gibbon, and Mr. Varney from exercising their rights under the Pennsylvania Constitution.

195.    Further, Instagram has limited Torquelist from exercising its rights under the Pennsylvania Constitution.

196.    Specifically, Instagram has held itself out as an open public forum, expressly for the purpose of allowing users to speak their minds on any number of topics. This includes political statements relating to firearms and their regulation.

197.    Armslist, Mr. Gibbon, and Mr. Varney have attempted to exercise and continue to seek to exercise their rights by posting their political opinions relating to firearms, firearms regulation, and lawmakers and advocacy groups involved in that debate.

12/02/2021 09:05 PM Westmoreland County    21CI03063

12/02/2021 09:05 PM Westmoreland County   21CI03063

198.    Torquelist has attempted to exercise and continues to seek to exercise its rights by posting its political opinions relating to cars, trucks, automotive regulation and lawmakers and advocacy groups involved in the debate.

199.    Plaintiffs have complied with all of Instagram's reasonable Terms and Use and Community Guidelines and have no information regarding any potential breach of those Terms and Guidelines.

200.    Instagram, however, has censored the Armslist, Mr. Gibbon, and Mr. Varney by banning them through the locking and deletion of their personal and business accounts, making them unable to comment on firearms or any topic on the Instagram platform.

201.    Further, Instagram has censored Torquelist by limiting visibility of the business account, limiting Torquelist's ability to comment on automobiles or any topic on the Instagram platform.

202.    This censorship and ban violates Art. 1, §7 of Pennsylvania's Constitution's guarantee that and "every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

203.    On information and belief, the censorship and ban are politically motivated, and are aimed at quelling criticism of, and potentially action against, Instagram by government actors as well as by the media and certain advocacy groups.

204.    Specifically, Armslist has become a visible political target for those advocating stricter gun control and opponents of the right to bear arms.  Instagram has responded to this political and social criticism by banning Armslist and those associated with it from using Instagram to engage in speech promoting the Second Amendment of the United States Constitution, Article

I, section 21 of the Pennsylvania State Constitution, fewer firearms restrictions, the importance of firearms in self-defense, and the historical and cultural primacy of firearms in America.

205.    Likewise, Instagram has banned Mr. Gibbon and Mr. Varney, effectively violating their rights to free speech and expression because of their association with Armslist.

206.    Similarly, Instagram has limited the visibility of the Torquelist account, effectively violating its rights to free speech and expression because of its association with Armslist.

207.    Plaintiffs therefore seek a declaration that Instagram's actions in locking, limiting the functionality of, limiting the visibility of, and deleting Plaintiffs' personal and business accounts violates the Pennsylvania Constitution.

208.    Plaintiffs further state that their inability to exercise their constitutional rights of speech and expression constitute existing and continuing irreparable harm for which there is no legal remedy.

209.    Plaintiffs therefore request that the Court provide equitable relief in the form of an injunction enjoining Instagram from continuing to lock, limit the functionality of, and delete the Plaintiffs' personal and business accounts or otherwise bar them from participating in the national debate on firearms policy on Instagram's public platform.

**COUNT TWO: BREACH OF CONTRACT**

210.    Plaintiffs restate the allegations of Paragraphs 1 through 209 and incorporates them here as if fully rewritten.

211.    Written contracts exist governing the relationship of Facebook and Plaintiffs and Instagram and Plaintiffs.

212.    Pennsylvania requires contracting parties to undertake their obligations with good faith.

213.    Defendants concede that such contracts exist, as evidence by their Preliminary Objections to the FAC.

214.    However, Defendants have exclusive custody of the contracts in place at the times when Defendants terminated Plaintiffs' pages and accounts.

215.    Further reflecting the one-side nature of the commercial relationship between the parties, Plaintiffs did not have an opportunity to review, negotiate, or propose alternative terms with respect to either the actual Facebook Contract or the actual Instagram Contract.

216.    In any event, upon information and belief, the actual Facebook Contract provided Plaintiffs with access to the Facebook platform in exchange for Facebook's access, use, and exploitation of Plaintiffs' user data. In addition, Facebook benefitted by accessing, using, and exploiting the data of Facebook users who interacted with Plaintiffs' Facebook pages.

217.    In exchange, Facebook agreed it would not terminate or suspect Plaintiffs pages and accounts so long as Plaintiffs complied with the terms of the actual contracts, including community guidelines and other terms incorporated into the actual contract by reference.

218.    Similarly, upon information and belief, the actual Instagram Contract provided Plaintiffs with access to the Instagram platform in exchange for Instagram's access, use, and exploitation of Plaintiffs' user data. In addition, Instagram benefitted by accessing, using, and exploiting the data of Instagram users who interacted with Plaintiffs' Instagram accounts.

219.    In exchange, Instagram agreed it would not terminate or suspend Plaintiffs accounts so long as Plaintiffs complied with the terms of the actual contracts, including community guidelines and other terms incorporated into the actual contract by reference.

220.    Facebook and Instagram breach of the actual contracts includes, but is not limited to:

21CI03063

12/02/2021 09:05 PM Westmoreland County

a.   Terminating Plaintiffs' pages and accounts on Facebook and Instagram despite Plaintiffs compliance with the terms of the actual contracts and related provisions;

b.   Failing to explain Plaintiffs' options upon termination;

c.   Failing to provide options to request a review of Defendants' decision to terminate Plaintiffs' pages and accounts;

d.   Failing to provide a method to contact either Facebook or Instagram to discuss Plaintiffs' belief that their pages and accounts were terminated in error.

221.   Both the actual Facebook and actual Instagram contracts include provisions allowing users to seek review of a page and account suspension or termination.

222.   Further, insofar as Defendants responded to Plaintiffs' inquiries at all following the termination of Plaintiffs pages and accounts, Defendants' responses did not provide any actual opportunities for Plaintiffs to exercise their rights under the actual contracts and were, as such, provided in bad faith, highlighting Defendants' breaches of the actual contracts.

223.   Defendants failed to use reasonable efforts to review the termination of Plaintiffs' pages and accounts, failed to provide a reasonable opportunity for Plaintiffs to seek a review of the decisions to terminate their pages and accounts, and otherwise failed to create policies and procedures to effectuate their obligations under the actual contracts with respect to their obligations to Plaintiffs following page and account termination and / or suspension.

224.   In short, despite the plain language of the contracts, Defendants never intended to and in fact did not provide a good faith, reasonable method for Plaintiffs to discuss or appeal the termination and / or suspension of their pages and accounts.

225.   Defendants' bad faith breaches of the operative contracts is further exemplified by their flagrant violation of Plaintiffs' constitutional rights, as noted above.  Defendants trammeled

Plaintiffs contractual and constitutional rights when Defendants decided it was commercial and politically expedient to do so, notwithstanding Plaintiffs' performance under the actual contracts and the benefit conferred on Defendants therein.

226.    As a result of Defendants' breaches, Plaintiffs have lost access to valuable channels for communicating with their customers: namely, their respective Facebook and Instagram pages and accounts.  As a consequence of the lost marketing and communications channels, Plaintiffs have been damaged in an amount not greater than $74,999.99.

## COUNT THREE: UNJUST ENRICHMENT
### (Pled in the alternative to Count Two)

227.    Plaintiffs restate the allegations of Paragraphs 1 through 209 and incorporates them here as if fully rewritten.

228.    Despite Defendants' contention that enforceable contracts govern this dispute—*see* Defendants' Preliminary Objections to the FAC—there is not, in fact, an enforceable agreement because the agreements lack consideration.

229.    Specifically, the text of the alleged Contracts provides Defendants unfettered discretion to terminate, suspend or take other adverse action vis-à-vis Plaintiffs' pages and accounts essentially without recourse. In other words, the text of the alleged Contracts coupled with how Defendants perform their purported obligations in practice demonstrate that the alleged Contracts did not, in fact, obligate Defendants to do any particular thing.

230.    While Defendants allow users to access Facebook and Instagram, any such benefit derived from accessing Defendants' platforms is incidental. That is because the primary benefit of allowing users to access their platforms inures to Defendants in the form of the user-generated data that is essential to Defendants' advertising business. As discussed *supra* user data is critical to Defendants' business models. In practice,  Defendants exercise the exclusive right to determine

when and if particular users (such as Plaintiffs) may continue using the platforms—regardless of whether a particular user has violated the relevant terms of use or not.

231.    Plaintiffs conferred a benefit on Defendants by creating and operating Facebook and Instagram pages and accounts. Defendants benefitted by gaining access to not only Plaintiffs' data, but also that of the other Facebook and Instagram users who interacted with Plaintiffs on both platforms.

232.    Defendants were aware of the benefit conferred by Plaintiffs; indeed, the alleged Contracts they attached to the Preliminary Objections responding to the FAC describe their right to access and use such data.

233.    Despite accepting and retaining the benefit conferred by Plaintiffs, Defendants have refused to even explain their conduct vis-à-vis Plaintiffs, let alone provide anything of value in payment—be it money or merely allowing Plaintiffs the opportunity to appeal the adverse actions taken against Plaintiffs' Facebook and Instagram pages and accounts.

234.    As a result, Defendants have been unjustly enriched in an amount no greater than $74,999.99, and Plaintiffs are entitled to restitution in that amount.

## COUNT FOUR: PROMISSORY ESTOPPEL
### (Pled in the alternative to Counts Two and Three)

235.    Plaintiffs restate the allegations of Paragraphs 1 through 209 and incorporates them here as if fully rewritten.

236.    Defendants knew, or reasonably should have known, that Plaintiffs would rely on their promises to (1) terminate or suspend accounts and pages only upon violation of contractual terms; (2) review any account and page termination or suspension upon request; and (3) provide an opportunity to contact Defendants in the event of a mistaken account and page termination or suspension.

12/02/2021 09:05 PM Westmoreland County   21CI03063

237.    Defendants knew, or reasonably should have known, that Plaintiffs valued their presence on Defendants' platforms—both as milieu for exercising rights under the United States and Pennsylvania constitutions, *and* as commercially valuable media for interacting with potential customers of Plaintiffs. As such, Defendants knew, or reasonably should have known, Plaintiffs would rely on representations that Plaintiffs reasonably perceived to limit Defendants' unilateral ability to terminate or suspend Plaintiffs' accounts.

238.    In fact, Plaintiffs relied on the promises that Defendants would (1) terminate or suspend accounts only upon violation of contractual terms; (2) review any account termination or suspension upon request; and (3) provide an opportunity to contact Defendants in the event of a mistaken page and/or account termination or suspension.

239.    Plaintiffs' reliance on these promises was reasonable. Defendants are large, sophisticated entities with international platforms and influence. Plaintiffs reasonably understood Defendants had the resources to follow through on their promises.  Plaintiffs relied on Defendants stated purposes to connect people and organizations, and their promises as noted above, to reasonably believe Defendants would not unilaterally, and without recourse, suspend or terminate Plaintiffs' pages and accounts.

240.    As a result of Defendants' representations, and Plaintiffs' reasonable reliance thereon, Plaintiffs are entitled to damages not greater than $74,999.99.

WHEREFORE,

As to Count One, Plaintiffs demand:

241.    A permanent injunction enjoining Facebook from continuing to lock the Plaintiffs' personal accounts or otherwise bar them from participating in the national debate on firearms policy on Facebook's public platform;

12/02/2021 09:05 PM Westmoreland County   21CI03063

12/02/2021 09:05 PM Westmoreland County   21CI03063

242.    A permanent mandatory injunction compelling Facebook to restore Plaintiffs' personal accounts and the Armslist business page to permit them to participate in the national debate on firearms policy on Facebook's public platform;

243.    A permanent mandatory injunction compelling Facebook to restore the Torquelist business page to permit Torquelist to participate in the national debate on automotive policy on Facebook's public platform;

244.    A permanent mandatory injunction compelling Facebook to restore the content of Plaintiffs' personal accounts and the Armslist business page to the state that they existed when locked or removed, thereby permitting them to participate in the national debate on firearms policy on Facebook's public platform;

245.    A permanent mandatory injunction compelling Facebook to restore the content of the Torquelist business page to the state that they existed when locked or removed, thereby permitting Torquelist to participate in the national debate on automotive policy on Facebook's public platform;

246.    A permanent injunction enjoining Instagram from continuing to lock, limit the functionality of, and delete the Plaintiffs' personal and the Armslist business accounts or otherwise bar them from participating in the national debate on firearms policy on Instagram's public platform;

247.    A permanent injunction enjoining Instagram from continuing to limit the visibility of the Torquelist business account or otherwise bar Torquelist from participating in the national debate on automotive policy on Instagram's public platform;

248.   A permanent mandatory injunction compelling Instagram to restore the Plaintiffs' personal and the Armslist business accounts to permit them to participate in the national debate on firearms policy on Instagram's public platform;

249.   A permanent mandatory injunction compelling Instagram to restore the full visibility of the Torquelist business accounts to permit Torquelist to participate in the national debate on automotive policy on Instagram's public platform;

250.   A permanent mandatory injunction compelling Instagram to restore the full functionality of Plaintiffs' personal and the Armslist business accounts to permit them to participate in the national debate on firearms policy on Instagram's public platform;

251.   A permanent mandatory injunction compelling Instagram to restore the content of Plaintiffs' personal and the Armslist business accounts to the state that they existed when locked, functionality was decreased, or deleted, thereby permitting them to participate in the national debate on firearms policy on Instagram's public platform;

252.   All fees and costs, including attorney's fees relating to this matter;

253.   Any other relief the Court deems just and equitable.

WHEREFORE,

As to Count Two, Plaintiffs demand:

254.   Damages not to exceed $74,999.99;

255.   A permanent injunction enjoining Facebook from continuing to lock the Plaintiffs' personal accounts or otherwise bar them from Facebook's public platform;

256.   A permanent mandatory injunction compelling Facebook to restore Plaintiffs' personal accounts and the Armslist business page to permit them on Facebook's public platform;

257.    A permanent mandatory injunction compelling Facebook to restore the Torquelist business page to permit Torquelist on Facebook's public platform;

258.    A permanent mandatory injunction compelling Facebook to restore the content of Plaintiffs' personal accounts and the Armslist business page to the state that they existed when locked or removed, thereby permitting them on Facebook's public platform;

259.    A permanent mandatory injunction compelling Facebook to restore the content of the Torquelist business page to the state that they existed when locked or removed, thereby permitting Torquelist to participate on Facebook's public platform;

260.    A permanent injunction enjoining Instagram from continuing to lock, limit the functionality of, and delete the Plaintiffs' personal and the Armslist business accounts or otherwise bar them from participating on Instagram's public platform;

261.    A permanent mandatory injunction compelling Instagram to restore the Plaintiffs' personal and the Armslist business accounts to permit them to participate on Instagram's public platform;

262.    A permanent mandatory injunction compelling Instagram to restore the full functionality of Plaintiffs' personal and the Armslist business accounts to permit them to participate on Instagram's public platform;

263.    A permanent mandatory injunction compelling Instagram to restore the content of Plaintiffs' personal and the Armslist business accounts to the state that they existed when locked, functionality was decreased, or deleted, thereby permitting them to participate on Instagram's public platform;

264.    A permanent mandatory injunction compelling Facebook to comply with the contract governing Plaintiffs' pages and accounts;

265.   A permanent mandatory injunction compelling Facebook to explain Plaintiffs' options upon suspension and/or termination of Plaintiffs' pages and accounts;

266.   A permanent mandatory injunction compelling Facebook to provide meaningful options for Plaintiffs to request a review of Facebook's decision to suspend and/or terminate Plaintiffs' pages and accounts;

267.   A permanent mandatory injunction compelling Facebook to provide a meaningful method for Plaintiffs to contact Facebook to discuss Plaintiffs' belief that their pages and accounts were suspended and/or terminated in error;

268.   A permanent mandatory injunction compelling Instagram to comply with the contract governing Plaintiffs' accounts;

269.   A permanent mandatory injunction compelling Instagram to explain Plaintiffs' options upon suspension and/or termination of Plaintiffs' accounts;

270.   A permanent mandatory injunction compelling Instagram to provide meaningful options for Plaintiffs to request a review of Instagram's decision to suspend and/or terminate Plaintiffs' accounts;

271.   A permanent mandatory injunction compelling Instagram to provide a meaningful method to contact Instagram to discuss Plaintiffs' belief that their accounts were suspended and/or terminated in error;

272.   All fees and costs, including attorney's fees relating to this matter;

273.   Any other relief the Court deems just and equitable.

WHEREFORE,

 As to Count Three, Plaintiffs demand:

274.   Damages not to exceed $74,999.99;

21CI03063

12/02/2021 09:05 PM Westmoreland County

275.    A permanent injunction enjoining Facebook from continuing to lock the Plaintiffs' personal accounts or otherwise bar them from Facebook's public platform;

276.    A permanent mandatory injunction compelling Facebook to restore Plaintiffs' personal accounts and the Armslist business page to permit them on Facebook's public platform;

277.    A permanent mandatory injunction compelling Facebook to restore the Torquelist business page to permit Torquelist on Facebook's public platform;

278.    A permanent mandatory injunction compelling Facebook to restore the content of Plaintiffs' personal accounts and the Armslist business page to the state that they existed when locked or removed, thereby permitting them on Facebook's public platform;

279.    A permanent mandatory injunction compelling Facebook to restore the content of the Torquelist business page to the state that they existed when locked or removed, thereby permitting Torquelist to participate on Facebook's public platform;

280.    A permanent injunction enjoining Instagram from continuing to lock, limit the functionality of, and delete the Plaintiffs' personal and the Armslist business accounts or otherwise bar them from participating on Instagram's public platform;

281.    A permanent mandatory injunction compelling Instagram to restore the Plaintiffs' personal and the Armslist business accounts to permit them to participate on Instagram's public platform;

282.    A permanent mandatory injunction compelling Instagram to restore the full functionality of Plaintiffs' personal and the Armslist business accounts to permit them to participate on Instagram's public platform;

283.    A permanent mandatory injunction compelling Instagram to restore the content of Plaintiffs' personal and the Armslist business accounts to the state that they existed when locked,

functionality was decreased, or deleted, thereby permitting them to participate on Instagram's public platform;

284.     A permanent mandatory injunction compelling Facebook to comply with the contract governing Plaintiffs' pages and accounts;

285.     A permanent mandatory injunction compelling Facebook to explain in detail the reasons for Facebook's suspension and/or termination of Plaintiffs' pages and accounts;

286.     A permanent mandatory injunction compelling Facebook to provide Plaintiffs meaningful options for appealing Facebook's decision to suspend and/or terminate Plaintiffs' pages and accounts;

287.     A permanent mandatory injunction compelling Facebook to provide a meaningful method for Plaintiffs to contact Facebook to discuss Plaintiffs' belief that their pages and accounts were suspended and/or terminated in error;

288.     A permanent mandatory injunction compelling Instagram to comply with the contract governing Plaintiffs' accounts;

289.     A permanent mandatory injunction compelling Instagram to explain in detail the reasons for Instagram's suspension and/or termination of Plaintiffs' accounts;

290.     A permanent mandatory injunction compelling Instagram to provide meaningful options to request a review of Instagram's decision to suspend and/or terminate Plaintiffs' accounts;

291.     A permanent mandatory injunction compelling Instagram to provide a meaningful method to contact Instagram to discuss Plaintiffs' belief that their accounts were suspended and/or terminated in error;

292.     All fees and costs, including attorney's fees relating to this matter;

12/02/2021 09:05 PM Westmoreland County    21CI03063

293.    Any other relief the Court deems just and equitable.

WHEREFORE,

As to Count Four, Plaintiffs demand:

294.    Damages not to exceed $74,999.99;

295.    A permanent injunction enjoining Facebook from continuing to lock the Plaintiffs' personal accounts or otherwise bar them from Facebook's public platform;

296.    A permanent mandatory injunction compelling Facebook to restore Plaintiffs' personal accounts and the Armslist business page to permit them on Facebook's public platform;

297.    A permanent mandatory injunction compelling Facebook to restore the Torquelist business page to permit Torquelist on Facebook's public platform;

298.    A permanent mandatory injunction compelling Facebook to restore the content of Plaintiffs' personal accounts and the Armslist business page to the state that they existed when locked or removed, thereby permitting them on Facebook's public platform;

299.    A permanent mandatory injunction compelling Facebook to restore the content of the Torquelist business page to the state that they existed when locked or removed, thereby permitting Torquelist to participate on Facebook's public platform;

300.    A permanent injunction enjoining Instagram from continuing to lock, limit the functionality of, and delete the Plaintiffs' personal and the Armslist business accounts or otherwise bar them from participating on Instagram's public platform;

301.    A permanent mandatory injunction compelling Instagram to restore the Plaintiffs' personal and the Armslist business accounts to permit them to participate on Instagram's public platform;

21CI03063   12/02/2021 09:05 PM Westmoreland County

302. A permanent mandatory injunction compelling Instagram to restore the full functionality of Plaintiffs' personal and the Armslist business accounts to permit them to participate on Instagram's public platform;

303. A permanent mandatory injunction compelling Instagram to restore the content of Plaintiffs' personal and the Armslist business accounts to the state that they existed when locked, functionality was decreased, or deleted, thereby permitting them to participate on Instagram's public platform;

304. A permanent mandatory injunction compelling Facebook to comply with the contract governing Plaintiffs' pages and accounts;

305. A permanent mandatory injunction compelling Facebook to terminate and/or suspend Plaintiffs' accounts and pages only upon violation of contractual terms;

306. A permanent mandatory injunction compelling Facebook to review any termination and/or suspension of Plaintiffs' accounts and pages;

307. A permanent mandatory injunction compelling Facebook to provide Plaintiffs an opportunity to contact Facebook in the event of a mistaken termination and/or suspension of Defendants' accounts and pages;

308. A permanent mandatory injunction compelling Instagram to comply with the contract governing Plaintiffs' accounts;

309. A permanent mandatory injunction compelling Instagram to terminate and/or suspend Plaintiffs' accounts only upon violation of contractual terms;

310. A permanent mandatory injunction compelling Instagram to review any termination and/or suspension of Plaintiffs' accounts.

311.   A permanent mandatory injunction compelling Instagram to provide an opportunity to contact Instagram in the event of a mistaken termination and/or suspension of Defendants' accounts;

312.   All fees and costs, including attorney's fees relating to this matter;

313.   Any other relief the Court deems just and equitable.

Respectfully submitted,

/s/ Charles Andrew Hayes
CHARLES ANDREW HAYES, ESQUIRE
PA I.D. NO.: 330964
WEGMAN HESSLER
6055 ROCKSIDE WOODS BLVD.
STE. 200
CLEVELAND, OHIO 44131
216-642-3342 (PHONE)
cahayes@wegmanlaw.com

*Attorney for Plaintiffs*
*Armslist LLC, Torquelist LLC,*
*Jonathan    Gibbon, and*
*N. Andrew Varney, III*

12/02/2021 09:05 PM Westmoreland County   21CI03063

12/02/2021 09:05 PM Westmoreland County   21CI03063

## STIPULATION

Plaintiffs swear and stipulate the amount of controversy in this case, provided it remains pending in a judicial forum, is no greater than $74,999.99, plus interest and costs, regardless of the amount of any judgment and / or verdict that might be returned in Plaintiffs' favor.  By the phrase "interest and costs," as those terms are used herein, Plaintiffs intend those terms to have the same meaning as they have under the federal removal statute, 28 U.S.C. § 1332.  Nothing in the above stipulation applies if this dispute proceeds in binding arbitration.

Date: ___12/2/21___                 By: _____

                                           Jonathan Gibbon, Chief Executive Officer
                                           Armslist LLC


## VERIFICATION

The undersigned, Jonathan Gibbon, hereby verifies that he is the Chief Executive Officer of **Armslist LLC**, is authorized to make this verification on its behalf and avers that the statements of fact contained in the attached SECOND AMENDED AND SUPPLEMENTAL COMPLAINT IN CIVIL ACTION are true and correct to the best of his knowledge, information and belief and that said statements are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: ___12/2/21___                 By: _____

                                           Jonathan Gibbon, Chief Executive Officer
                                           Armslist LLC

64

## STIPULATION

Plaintiffs swear and stipulate the amount of controversy in this case, provided it remains pending in a judicial forum, is no greater than $74,999.99, plus interest and costs, regardless of the amount of any judgment and / or verdict that might be returned in Plaintiffs' favor.  By the phrase "interest and costs," as those terms are used herein, Plaintiffs intend those terms to have the same meaning as they have under the federal removal statute, 28 U.S.C. § 1332.  Nothing in the above stipulation applies if this dispute proceeds in binding arbitration.

Date: 12/2/21                        By: 

Jonathan Gibbon, Chief Executive Officer
Torquelist LLC

## VERIFICATION

The undersigned, Jonathan Gibbon, hereby verifies that he is the Chief Executive Officer of **Torquelist LLC**, is authorized to make this verification on its behalf and avers that the statements of fact contained in the attached SECOND AMENDED AND SUPPLEMENTAL COMPLAINT IN CIVIL ACTION are true and correct to the best of his knowledge, information and belief and that said statements are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: 12/2/21                        By: 

Jonathan Gibbon, Chief Executive Officer
Torquelist LLC

12/02/2021 09:05 PM Westmoreland County   21CI03063

## **STIPULATION**

Plaintiffs swear and stipulate the amount of controversy in this case, provided it remains pending in a judicial forum, is no greater than $74,999.99, plus interest and costs, regardless of the amount of any judgment and / or verdict that might be returned in Plaintiffs' favor.  By the phrase "interest and costs," as those terms are used herein, Plaintiffs intend those terms to have the same meaning as they have under the federal removal statute, 28 U.S.C. § 1332.  Nothing in the above stipulation applies if this dispute proceeds in binding arbitration.

Date: ___12/2/21___                    By: _____
                                                                      Jonathan Gibbon

## **VERIFICATION**

The undersigned, **Jonathan Gibbon**, avers that the statements of fact contained in the attached SECOND AMENDED AND SUPPLEMENTAL COMPLAINT IN CIVIL ACTION are true and correct to the best of his knowledge, information and belief and that said statements are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: ___12/2/21___                    By: _____
                                                                      Jonathan Gibbon

12/02/2021 09:05 PM Westmoreland County   21CI03063

## STIPULATION

Plaintiffs swear and stipulate the amount of controversy in this case, provided it remains pending in a judicial forum, is no greater than $74,999.99, plus interest and costs, regardless of the amount of any judgment and / or verdict that might be returned in Plaintiffs' favor.  By the phrase "interest and costs," as those terms are used herein, Plaintiffs intend those terms to have the same meaning as they have under the federal removal statute, 28 U.S.C. § 1332.  Nothing in the above stipulation applies if this dispute proceeds in binding arbitration.

Date: 12/2/2021                       By: _____
                                           N. Andrew Varney, III

## VERIFICATION

The undersigned, **N. Andrew Varney, III**, avers that the statements of fact contained in the attached SECOND AMENDED AND SUPPLEMENTAL COMPLAINT IN CIVIL ACTION are true and correct to the best of his knowledge, information and belief and that said statements are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: 12/2/2021                       By: _____
                                           N. Andrew Varney, III

67

12/02/2021 09:05 PM Westmoreland County   21CI03063

12/02/2021 09:05 PM Westmoreland County   21CI03063

## CERTIFICATE OF SERVICE

I, Charles Andrew Hayes, hereby certify that a true and correct copy of the SECOND

AMENDED AND SUPPLEMENTAL COMPLAINT IN CIVIL ACTION was served on

December 2, 2021, upon counsel listed below via electronic mail:


Jack B Cobetto
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street
44th Floor
Pittsburgh, PA 15219
jcobetto@eckertseamans.com

Audrey K. Kwak
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street
44th Floor
Pittsburgh, PA 15219
akwak@eckertseamans.com


By:

*/s/ Charles Andrew Hayes*
CHARLES ANDREW HAYES, ESQUIRE
PA I.D. NO.: 330964
WEGMAN HESSLER
6055 ROCKSIDE WOODS BLVD.
STE. 200
CLEVELAND, OHIO 44131
216-642-3342 (PHONE)
cahayes@wegmanlaw.com

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

By:

/s/ Charles Andrew Hayes
CHARLES ANDREW HAYES, ESQUIRE
PA I.D. NO.: 330964
WEGMAN HESSLER
6055 ROCKSIDE WOODS BLVD.
STE. 200
CLEVELAND, OHIO 44131
216-642-3342 (PHONE)
cahayes@wegmanlaw.com

12/02/2021 09:05 PM Westmoreland County   21CI03063